Jennifer A. Miller (Cal. Bar No. 320823)
Whitney M. Carlson (Cal. Bar No. 308024)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
555 California Street
Suite 4925
San Francisco, CA 94104
Telephone: (415) 659-7923
Email: jamiller@beneschlaw.com
Email: wcarlson@beneschlaw.com

J. Erik Connolly (*pro hac vice* forthcoming)
Nicole E. Wrigley (*pro hac vice* forthcoming)
Michael E. Bloom (*pro hac vice* forthcoming)
Kate Watson Moss (*pro hac vice* forthcoming)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
333 W. Wacker Dr. Suite 1900
Chicago, IL 60606
Telephone: (312) 212-4949
Email: econnolly@beneschlaw.com
Email: nwrigley@beneschlaw.com
Email: mbloom@beneschlaw.com
Email: kwatsonmoss@beneschlaw.com

*Attorneys for Plaintiffs i3 Brands, Inc. and
PartProtection, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| i3 BRANDS, INC., and PARTPROTECTION, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CDK GLOBAL, LLC, and THE REYNOLDS AND REYNOLDS COMPANY, )<br><br>Defendants. ) | No. '19CV0252 MMA KSC<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1. The principal shareholder and President of Plaintiffs i3 Brands, Inc. ("i3 Brands") and PartProtection LLC ("PartProtection"), Michael Lucas, grew up at an auto dealership. He was raised in a small town in Oregon, and starting at the age of 9, helped his father—an owner of a Chevrolet dealership—with all sorts of tasks, including washing cars and assisting in the parts and sales departments. Driven by his experience working at his father's dealership, Mr. Lucas became an entrepreneur after high school and, ultimately, a pioneer in developing internet-based software and products for auto dealerships and consumers.

2. PartProtection is Mr. Lucas's latest innovative concept. Customers that shop at dealerships offering PartProtection can purchase a 36-month, unlimited-miles service contract and/or lifetime warranties for individual parts on their vehicles. Few dealerships (if any) had previously offered this service, and those that now offer it to their customers have reported that it has substantially increased their revenue and customer retention. In fact, an executive who works for Defendant Reynolds and Reynolds ("Reynolds") has described PartProtection as the "best idea" he has heard in the thirty years he has worked with Reynolds' Owner, CEO, and Chairman, Bob Brockman.

3. That Mr. Lucas has been able to establish a footprint in the auto services industry is a miracle because corporate behemoths, Defendants Reynolds and CDK Global, LLC ("CDK") (collectively, "Defendants"), have dominated that industry for years and have used their positions of power to oppress entrepreneurs, such as Mr. Lucas, who have posed a threat to them.

4. Defendants are able to control the auto services industry because they have been the duopoly providers of Dealer Management Systems ("DMS"), which are software products that virtually every auto dealership in the United States uses to store dealer and customer data to manage their businesses (*e.g.*, accounting, sales, fixed operations—parts, service, and collision—and human resources). Together,

1

they control approximately 75% of the United States market by number of dealers and at least 90% when measured by vehicles sold.

5.     Every vendor that supplies a software-based product to a dealership, including Plaintiff PartProtection, needs to access the data stored on the dealership's DMS to serve its customers.  A dealership's data is not stored in a useable form on the DMS, though, which means that i3 Brands and PartProtection must pay third party "data integrators" to access Defendants' DMS and transmit the data they need to serve their dealership clients.

6.     Prior to 2015, the market for data integration providers was competitive: Reynolds and CDK offered data integration services, but i3 Brands and PartProtection could also retain third parties, such as non-party Authenticom, Inc., to perform the same function.  In other words, pricing for data integration was driven by market forces because Reynolds and CDK were competing with each other, and other competitors also threatened to undercut their pricing.

7.     In February 2015, though, Defendants conspired to destroy all competition in the data integration market through a series of illegal agreements, including an agreement to block third-party data integrators from accessing their DMS—eliminating competition to Defendants' own data integration programs, such as Authenticom and Autoloop—thereby forcing third-party solution providers (such as Plaintiffs) to use CDK and Reynolds for data integration services.  Moreover, CDK and Reynolds agreed that they would not compete to provide data integration services to connect vendors with the others' DMS.  In other words, based on Defendants' agreements, vendors have no choice but to retain CDK as their data integrator for CDK's DMS and Reynolds as their data integrator for Reynolds' DMS.

8.     Through those agreements, Defendants effectively eradicated all competition in the data integration market, allowing them to charge i3 Brands and PartProtection monopolistic data integration fees.  The inflated fees not only

2

improved Defendants' bottom lines; they also opened up opportunities for Defendants to "tilt the table" in the industry to favor their own interests. For example, Defendants offer many products to dealerships that compete with products offered by Plaintiffs and other vendors that must submit to Defendants' data integration fees. Defendants benefit from their anticompetitive prices because they can charge vendors, such as Plaintiffs, exorbitant data integration fees (which Plaintiffs must either absorb or pass along in the form of higher prices to dealerships) while Defendants pay nothing for data integration. Defendants can, therefore, offer their products to dealerships at rates that are substantially lower than the rates offered by the victims of Defendants' scheme, including Plaintiffs, and drive them out of business.

9.      Defendants' anticompetitive conduct violates the antitrust laws of the United States and the unfair trade practices statutes of the State of California.[1] Their conduct has also substantially harmed Mr. Lucas and his businesses, i3 Brands and PartProtection, in multiple respects.

10.      *First*, Defendants have forced exorbitant, artificially inflated data integration fees upon i3 Brands and PartProtection. These "bloated" fees, as one court has described them, injure vendors like Plaintiffs not only because they must pay them, but also because the fees make Plaintiffs' products and services more expensive and, therefore, less attractive to dealers.

---

[1] Several other vendors and dealerships have brought complaints against Defendants asserting claims predicated on Defendants' anticompetitive agreements, and those cases have been consolidated for discovery purposes in a Multi-District Litigation captioned *In re Dealer Management Systems Antitrust Litigation*, No. 18-cv-864 (N.D. Ill.). Plaintiffs cite herein (and reference verbatim from time to time) certain allegations of anticompetitive conduct raised in their complaints, which were accepted as fact, in substantial part, by the Western District of Wisconsin after it conducted an evidentiary hearing in *Authenticom, Inc. v. CDK Global, LLC*, 2017 U.S. Dist. LEXIS 109409 (W.D. Wis. July 14, 2017), *vacated on other grounds*, 874 F.3d 1019 (7th Cir. 2017). Plaintiffs have also confirmed allegations in those complaints based on personal experience/knowledge and independent investigation.

COMPLAINT

11. **Second**, by obtaining control of the data integration market, Defendants were able to "tilt the table" in favor of their own products and interests by either delaying integration to competitors; providing only limited integration to competitors; or refusing to provide integration altogether. In fact, Defendants both used their positions of power, procured through their anticompetitive agreements, to sabotage lucrative business opportunities developed by Plaintiffs.

12. **Third**, by charging their bloated fees, Defendants have artificially reduced the value of Plaintiffs' businesses. In fact, as a result of Defendants' anticompetitive behavior, Plaintiff i3 Brands was forced to sell three of its brands to Reynolds for millions less than they would have been worth in a competitive data integration marketplace.

13. **Finally**, consistent with its strategy to destroy competitors through anticompetitive practices and "tilt the table" in favor of itself, Reynolds plotted and executed a scheme to steal PartProtection's trade secrets and use them to create a competing product it hopes will drive PartProtection out of business. As set forth in greater detail below, Reynolds entered into a partnership agreement with PartProtection under which it agreed to promote PartProtection, but it used that agreement as a pretext to access PartProtection's trade secrets and *create a replica of PartProtection's business*. Reynolds' breach of the partnership agreement and misappropriation of PartProtection's trade secrets threaten to destroy PartProtection, while Reynolds' competing product is estimated to be worth *hundreds of millions of dollars*. Thus, in this instance, Reynolds is not merely "tilting the table" to disadvantage PartProtection, but is attempting to completely undercut it.

## PARTIES

14. Plaintiff i3 Brands is a Delaware corporation with its principal place of business in Del Mar, California. It is a technology-based corporation that has developed a portfolio of entities specializing in software and data-driven solutions in the automotive industry.

4

15.     Plaintiff PartProtection is a Delaware limited liability company with its principal place of business in Del Mar, California.  It is a wholly owned subsidiary of i3 Brands.  PartProtection has revolutionized the auto parts industry through its point-of-sale product that allows motorists to extend the warranty coverage for the Original Equipment Manufacturer ("OEM") parts on their cars.

16.     Non-party Parts.com was a brand and product previously owned by i3 Brands that i3 Brands sold to Reynolds in April 2017.  It is an online marketplace for OEM parts.

17.     Non-party TradeMotion was a brand and product previously owned by i3 Brands that i3 Brands sold to Reynolds in April 2017.  It is an eCommerce parts software, parts services, and data solutions provider for the automotive industry.

18.     Defendant CDK is a publicly traded Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169.  CDK's headquarters for the western region of the United States are located at 1100 Town and Country Road, Suite 800, Orange, California 92868. CDK provides DMS software and services to automobile dealerships throughout the United States and has more than $2 billion in annual revenue.  In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company.  Prior to the spin-off, CDK was referred to as ADP Dealer Services (referred collectively herein as "CDK").  In addition to its DMS platform, CDK also provides data integration services and offers products and services that compete directly with i3 Brand's solutions, including products and services that compete with solutions offered by PartProtection.

19.     Defendant Reynolds is an Ohio corporation with its corporate headquarters and principal place of business located at One Reynolds Way, Kettering, Ohio 45430.  Like CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in California.  To service those dealerships in California, Reynolds has many employees that work in

5

and travel to the state. Like CDK, Reynolds provides data integration services as well as products and services that compete directly with i3 Brands' solutions, including products and services that compete with solutions offered by PartProtection. Reynolds was acquired by Bob Brockman in 2006 in a leveraged buyout and was subsequently taken private.

## JURISDICTION AND VENUE

20.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and California state law.

21.     This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26. This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so closely related to the federal claims that they constitute part of the same constitutional case.

22.     This Court has personal jurisdiction over Defendants pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d), and the nationwide service provisions therein. Defendants have engaged in the unlawful acts described in this Complaint with the foreseeable or intended effects of causing substantial economic harm to i3 Brands and PartProtection in California, and Defendants have purposely availed themselves of the privilege of doing business in California through the widespread promotion, sale, and distribution of their products and services in the State.

23.     Venue is proper in the Southern District of California pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d). Defendants are registered to do business, have transacted business, were found, and had agents in the Southern District of California; a substantial part of the events giving rise to the claims set forth herein occurred in the District; a substantial portion of the affected interstate trade and commerce described

herein has been carried out in the District. i3 Brands and PartProtection have also served dealers in California that use a CDK or Reynolds DMS.

24. Defendants' unlawful conduct substantially affected interstate commerce by harming competition, increasing prices and decreasing quality, and limiting output, to the detriment of i3 Brands and PartProtection.

## FACTUAL ALLEGATIONS

## I. DEFENDANTS CONSPIRE TO ELIMINATE COMPETITION IN THE DATA INTEGRATION MARKET

25. As described in greater detail below, Plaintiffs i3 Brands and PartProtection have been harmed in several respects because Defendants Reynolds and CDK have entered into anticompetitive agreements with the goal of eliminating all competition in the data integration industry. Defendants' conspiracy has permitted them to charge supracompetitive data integration prices to vendors of automotive services, such as Plaintiffs, and "tilt the table" in favor of their own products that they sell to dealerships.

26. In support of their claims that Defendants have engaged in illegal, anticompetitive conduct, Plaintiffs set forth below:

(A) the relevant product markets involved in Defendants' conspiracy;

(B) the details of Defendants' anticompetitive conduct;

(C) the harm to competition caused by Defendants' anticompetitive conduct; and

(D) that there is no pro-competitive justification for Defendants' actions.

### A. The Relevant Product Markets

27. The auto industry in the United States, in its simplest form, consists of: manufacturers of automobiles; the dealers that sell those automobiles; and end-purchasers of automobiles, including businesses and consumers. A separate industry exists of "vendors" that provide services and supplemental products that dealerships can offer to their customers when they purchase their cars or are otherwise at the

7

dealership. For example, PartProtection is a vendor that offers an extended-warranty product to dealerships, and dealerships that contract with PartProtection can offer its warranties to their customers, including independent repair facilities.

28. Virtually all dealerships in the United States manage their operations by storing and retrieving data from a DMS, and Defendants are the duopoly providers of DMS. All vendors, such as PartProtection, must access a dealership's data stored on its DMS to provide services to the dealership's customers. Even though the dealership's data belongs to the dealership, a vendor must still retain a "data integrator" to compile the data it needs from the dealership's DMS and provide it in a useable form to the vendor. Thus, one substantial cost that Plaintiffs and other vendors incur is the fee they pay "data integrators." The following diagram illustrates the relationship between dealerships, DMS providers, data integrators, and vendors:



29. By its nature, Defendants' anticompetitive conspiracy implicates the following relevant markets: (1) the DMS market in the United States; (2) the Dealer Data Integration Market in the United States; and (3) the Dealer Data Integration Single-Brand Aftermarket. Each of those markets is described in detail below.

### 1. The DMS Market

30. The DMS is enterprise software used by retail automotive dealerships to manage their business, including sales, financing, inventory management, repairs

and service, accounting, payroll, human resources, and marketing. The DMS has been analogized to the central nervous system of a car dealership.

31.    The DMS also includes a database used to store certain dealer data, including vehicle and parts inventory, customer name and contact information, completed and pending sales, finance and insurance information, service and repair information, and more.

32.    Over time, the DMS became the center of a dealer's retail management platform. Virtually every franchised new car dealership in the United States now uses a DMS. And while dealers generate much of their data outside of the DMS in separate software solutions, as a practical matter, a substantial portion of dealer data is stored on the DMS, even though there is no technical reason why that must be the case.[2]

33.    The DMS market is comprised of those providers that market and sell DMS services to franchised new car dealers in the United States. There is public and industry recognition of the DMS market.[3]

### a.    CDK and Reynolds Dominate the DMS Market

34.    Defendants CDK and Reynolds dominate the DMS market. About 45 percent of dealer "rooftops" (*i.e.*, franchised stores located at a physical location) use CDK's DMS, and about 30 percent use Reynolds' DMS. When measured using the number of vehicles sold from franchised dealers, CDK and Reynolds control more than 90 percent of the DMS Market. Industry publications have described CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."[4]

---

[2] *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-00864, Dkt. No. 191 at ¶ 41 (N.D. Ill. June 5, 2018) (hereinafter "*Autoloop* Compl.").
[3] *Autoloop* Compl. ¶ 42.
[4] *Authenticom, Inc. v. CDK Glob., LLC et al.,* No. 17-v-00318, Dkt. No. 4 at ¶ 43 (W.D. Wis. May 1, 2017) (hereinafter "*Authenticom* Compl."); *Autoloop* Compl. ¶ 43.

9

35. CDK's and Reynolds' DMS businesses are very lucrative. A single, small dealership pays up to $150,000 per year for a DMS software license and services. Mid-size dealership groups (5 to 10 stores) pay $1,500,000 or more per year, and large dealership groups can easily pay more than $5,000,000 per year. CDK's and Reynolds' profit margins on their DMS are estimated to exceed 40 percent.[5]

**b. The CDK and Reynolds Duopoly Has Proven Durable**

36. Significant barriers to entry protect CDK's and Reynolds' dominant positions in the DMS market. ***First***, CDK and Reynolds have locked dealers into lengthy contracts. CDK and Reynolds sell their respective DMS software and services pursuant to long-term contracts that are typically between five and seven years in length. These contracts often include automatic extensions if new services are ordered in the middle of the contract.[6]

37. The barriers to entry are so high that even Microsoft could not compete in this market. In fact, Microsoft tried to enter the DMS market in 2006, but its venture quickly failed. A Microsoft executive even asserted that "[w]e kind of got ahead of ourselves," in its attempt to compete with Defendants. David Barkholz, *Dealers Get New Management System Option*, Automotive News (Dec. 2, 2012).

38. ***Second***, switching costs are high. Switching DMS providers presents significant logistical challenges and is highly disruptive to business operations. It can take a dealership over a year to prepare, train staff, and run tests before a new DMS can be put into operation, all while the dealership is also trying to sell and service cars. The financial costs in terms of training and implementation are significant.[7]

39. One industry executive stated that changing DMS providers "is akin to

---

[5] *Autoloop* Compl. ¶ 46.
[6] *Autoloop* Compl. ¶ 47.
[7] *Autoloop* Compl. ¶ 48.

a heart transplant." David Barkholz, *DMS Dilemma: Why It's So Hard to Switch – Upstarts Battle Big 2, But Dealers Weigh Cost vs. Comfort Zone*, Automotive News (May 10, 2010). CDK's Global CEO also recently acknowledged that "switching DMS providers can be very difficult. It [is quite a] process [to] change and takes time, which is part of the reason that many dealers are hesitant to switch." Thomson Reuters StreetEvents, Edited Transcript: CDK – Q1 2017 CDK Global, Inc. Earnings Conference Call, at 3 (Nov. 2, 2016) (statement by CDK CEO Brian MacDonald).[8]

## 2. The Dealer Data Integration Market

40. The Dealer Data Integration Market consists of services that provide vendors, such as PartProtection, with access to dealer data on the DMS, including CDK's and Reynolds' own in-house data integration services. Data integrators may also provide value-enhancing services, such as putting data from different DMS in a uniform format, data hygiene (*i.e.*, error correction), and granular control by dealers over which vendors receive which data.[9]

41. Before a data integrator can access dealer data on the DMS, the data integrator must receive specific authorization from the dealer. To grant such access, dealers enter into contracts with data integrators that authorize the data integrator to access the dealer's data.[10]

42. There is public and industry recognition of the existence of a Dealer Data Integration Market distinct from the DMS market. For example, CDK has described its data integration services as "a stand-alone product" separate from its core DMS product. CDK, Annual Report (Form 10-K) (Aug. 13, 2015), at 4. The Dealer Data Integration Market also has its own supply and demand curves. The usage of integrated vendor solutions—and hence the amount of data integration services—has fallen relative to what it would be in a competitive market in response

---

[8] *Authenticom* Compl. ¶ 40.
[9] *Autoloop* Compl. ¶ 56.
[10] *Autoloop* Compl. ¶ 57.

to supracompetitive prices charged for data integration services by CDK and Reynolds because a significant portion of those costs are passed on to dealers. There are also no reasonable substitutes for services provided by data integrators, demonstrated most clearly by the fact that CDK and Reynolds, after closing their systems, have been able to impose massive price increases for their data integration services.[11]

43.     Geographically, the Dealer Data Integration Market covers the United States.[12]

**a.     The Dealer Data in the DMS Belongs to the Dealers**

44.     Even though certain dealer data is stored on the DMS, that data still belongs to the dealers. The dealers therefore should decide who to authorize to access their data. CDK and Reynolds have repeatedly admitted this fundamental fact in public statements, on their websites, and in their DMS contracts with dealers. For example, Tom Schwartz, Reynolds' chief spokesperson, has publicly declared: "The data belongs to the dealers. We all agree on that." David Barkholz, *Dealers Decry Reynolds Crackdown*, Automotive News (Nov. 21, 2011).[13]

45.     For many years, CDK has also publicly recognized the fundamental principle that dealers, as owners of their data, have the right to control access to and use of that data. For example, Steve Anenen, CDK's longtime CEO, publicly stated that dealers have the right to grant third parties access to, and use of, their data. He told the industry publication Automotive News, "We're not going to prohibit that or get in the way of that." Ralph Kisiel, *ADP Provides Dealers 3 Options on Data Access*, Automotive News (Feb. 19, 2007). "I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it, when in fact it's really the data belonging to the dealer. As long as they grant

---

[11] *Autoloop* Compl. ¶ 58.
[12] *Autoloop* Compl. ¶ 59.
[13] *Autoloop* Compl. ¶¶ 60–61.

permission, how would you ever go against that wish?" *Id*.[14]

**b.    Participants in the Data Integration Market**

46.    At one time, there were approximately a dozen competitors in the Dealer Data Integration market, such as SIS and SelectQu.  CDK's and Reynolds' anticompetitive behavior has driven most of them out of the market.  Today, there are effectively only three remaining commercial data integrators serving CDK's and Reynolds' dealers: Reynolds through its "RCI" product, CDK through its "3PA" product, and Authenticom.  Subject to its own litigation against CDK and Reynolds, Authenticom's ability to remain in business is in doubt.  Therefore, vendors such as Plaintiffs have, effectively, only one integration option with respect to dealer data on a CDK DMS—CDK itself.[15]  The same is true of Reynolds.

**i.    CDK**

47.    CDK provides integration with dealer data on the CDK DMS through an interface offered by CDK under its 3PA program.  The 3PA program's managed interface is used exclusively for data integration with the CDK DMS.[16]

48.    Prior to early 2015—when CDK colluded with Reynolds to "close" its DMS— CDK offered several ways by which dealers could share their data.  For example, CDK offered a "basic access" package where dealers supplied vendors with a user ID and password by which the vendors or their data integrators could access dealer data on CDK's DMS.  Before 2015, CDK also allowed dealers to use other data integrators that competed with 3PA.[17]

49.    CDK revamped the 3PA program in June 2015.  Under the "refreshed" 3PA program, CDK declared that the 3PA program's managed interface is the only CDK-approved method of integrating with a CDK DMS. It now labels any other

---

[14] *Autoloop* Compl. ¶ 66.
[15] *Autoloop* Compl. ¶ 69.
[16] *Autoloop* Compl. ¶ 70.
[17] *Autoloop* Compl. ¶ 71.

13

method for accessing data "unauthorized," and it disables login credentials that any dealer provides to a third party. Today, CDK disables login credentials used by third-party data integrators even though its own dealer contracts specifically permit access by "agents" of the dealers.[18]

50.    CDK also owns two third-party data integrators, DMI and IntegraLink. DMI and IntegraLink obtain authorization from dealers to pull data from the dealer's DMS in the same way as other data integrators and provide that data to vendors. For over a decade, DMI and IntegraLink provided data integration services for CDK itself and a variety of other DMS platforms, including Reynolds. CDK, however, largely discontinued these services once CDK and Reynolds entered into their February 2015 agreement not to compete, which is described below.[19]

## ii.    Reynolds

51.    Reynolds provides integration with dealer data on the Reynolds DMS through its RCI service, which is Reynolds' equivalent to 3PA. Like the 3PA program, RCI is now the only means by which vendors are allowed to integrate with dealer data on Reynolds' DMS. Reynolds does not have a data integration service that works with other DMS platforms.[20]

## iii.    Authenticom and Other Independent Integrators

52.    Authenticom was founded in 2002, introduced its data integration service in 2004, and has served more than 15,000 dealers in that time. Authenticom provides data integration services for all available DMS platforms, including Reynolds and CDK, and is the last significant independent data integration provider in the market.[21]

53.    Authenticom's standard pricing to pull data is $25 per dealer per month

---

[18] *Autoloop* Compl. ¶ 72.
[19] *Autoloop* Compl. ¶¶ 73, 76.
[20] *Autoloop* Compl. ¶ 77.
[21] *Autoloop* Compl. ¶¶ 78–79.

14

for the first data set, and then $50 per dealer per month for two or more. According to Authenticom, the average price a vendor pays to pull data is between $30 and $40 per dealer per month. For bi-directional integration, Authenticom has charged at most $75 per dealer per month, and that price included additional services, such as data hygiene.[22]

54. Apart from Authenticom, there were once many other independent integrators in the market—such as SIS, SelectQu, and others—before CDK and Reynolds drove them from the market.[23]

### 3. The Single-Brand Aftermarkets for Dealer Data Integration Services

55. The markets for dealer data integration for dealers using Defendants' DMS products are cognizable, brand-specific antitrust aftermarkets. The aftermarket for dealer data integration is derivative of the primary DMS market because, if there were no DMS systems in the first place, there would be no demand for integration services for dealer data on those systems.[24]

56. When dealers purchase Defendants' DMS platforms, they are locked into those purchases because of high switching costs, as described above.[25]

57. Information costs prevent dealers from accurately factoring in Defendants' higher data integration fees when they choose their DMS provider. Among other things, CDK and Reynolds are not transparent with dealers about their data integration fees. On the contrary, Defendants impose price secrecy provisions on application providers, which frustrates the flow of information and prevents dealers from engaging in accurate lifecycle pricing. Similarly, dealers had no reason to believe that Defendants would switch positions with respect to data access after

---

[22] *Authenticom* Compl. ¶ 82.
[23] *Autoloop* Compl. ¶ 81.
[24] *Authenticom* Compl. ¶¶ 111–12.
[25] *Autoloop* Compl. ¶ 83.

CDK and Reynolds had already locked them into long-term DMS contracts. For example, given CDK's unequivocal public statements, dealers could not have known that CDK would make an abrupt change and seize control over access to dealer data.[26]

58. Because of these market imperfections, Defendants are profitably charging supracompetitive prices for dealer data integration on their DMS. That Defendants have been able to impose such large price increases for integration services on its DMS demonstrates that there are no reasonable substitutes for that service.[27]

**B. Defendants' Anticompetitive Conduct**

**1. CDK's and Reynolds' *Per Se* Unlawful Horizontal Agreement To Eliminate Competition in the Data Integration Market**

**a. CDK's DMS Was "Open" Prior to 2015**

59. Third-party access was once a key point of competition between CDK and Reynolds. Prior to 2015, CDK publicly touted its open system as one of the competitive advantages of its DMS. By contrast, in 2009, Reynolds began selectively blocking third-party access, and increased its blocking efforts in 2013.[28]

60. CDK was successful in marketing its "open" DMS as a competitive advantage over the Reynolds DMS, and dealers purchased DMS services from CDK based, in part, on CDK's public representations and unchanged contractual language allowing for such access. As a result, CDK very slowly gained market share from Reynolds. Over a decade, Reynolds' DMS market share declined from about 40 to 30 percent, with most dealers leaving Reynolds for CDK.[29]

61. That competition between CDK and Reynolds abruptly halted in 2015,

---

[26] *Authenticom* Compl. ¶ 114.
[27] *Authenticom* Compl. ¶ 115.
[28] *Autoloop* Compl. ¶ 86.
[29] *Autoloop* Compl. ¶ 87.

16

when CDK suddenly "closed" its system.  Given CDK's unequivocal public statements, CDK's abrupt about-face came as a complete surprise to the market.[30]

**b.**   **CDK "Closed" Its DMS in 2015 after Entering into an Agreement with Reynolds To Eliminate Competition in the Data Integration Market**

**i.**   **CDK's Internal Documents Reveal Its Motivation for Colluding with Reynolds**

62.    In 2014, CDK decided that it wanted to capture more value for itself by charging dramatically increased rates for integration with dealer data.  Prior to entering into its unlawful agreements with Reynolds, CDK charged on average $70 per dealer per month for integration. Dealers could choose methods of access on a vendor-by-vendor basis, giving dealers flexibility in managing how their vendors obtained data and the costs that would be passed through to the dealers.  But by closing its DMS, CDK saw an opportunity to impose huge price increases on its data integration services—increasing CDK's profits while also advantaging its competing products and services by raising the input costs and decreasing the integration available to its rivals.  Internal CDK presentations specifically recognized the "risk of vendors willing to move" to competing data integrators "instead of accept increase price" if those competing integrators were allowed to continue to provide their services.[31] *Authenticom* Dkt. No. 163 at 134:11–15.[32]

63.    In addition, CDK believed that destroying competition for data integration and subsequently raising prices for data integration would help address the threat posed by standalone products and services to the primacy of the DMS to a dealer's operations.  The growth of standalone solutions, especially sales and

---

[30] *Autoloop* Compl. ¶ 88.

[31] *Autoloop* Compl. ¶ 89.

[32] Citations to the Transcripts of the Hearing on Plaintiff's Motion for Preliminary Injunction held June 26–28, 2017, in *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, are referred to herein by their respective docket numbers (Dkt. Nos. 162–66).

service customer relationship management applications, have threatened to reduce the importance of the DMS as dealers increasingly manage their operations through the standalone solutions outside of the DMS. Moreover, many of those solutions are where dealers generate much of their data in the first instance—for example, customer relationship management software products are often where dealers first capture and store information about their customers and sales transactions—and, as those products are able to host and manage a dealer's data, the DMS again loses its importance. By "closing" its DMS and raising the input costs for standalone solutions, CDK forestalled the growth of those solutions, which is what would naturally occur absent the anticompetitive restraints.[33]

64. Finally, CDK and Reynolds sought to advantage their own offerings that compete with products and services provided by other vendors such as Plaintiffs. Destroying competition for data integration gave Defendants control over competing service providers' access to, and ability to use and update, dealer data. Defendants recognized that they could "tilt the table" in favor of their own applications by withholding needed data access, imposing use restrictions, and limiting write permissions for certain data elements. Their actions have disrupted the workflow of competing solutions, and denied data access completely for some competing offerings.[34]

65. Internal CDK strategy documents reveal the specific purposes of CDK's conspiracy with Reynolds. According to CDK, "One of the 3PA Program's principles was to protect CDK products through a tilt-the-table approach." *Authenticom* Dkt. No. 163, at 140:13–15. By "tilt the table," CDK meant it would advantage its products and services over those of third-party vendors by providing itself greater access and use rights to dealer data. CDK intended to keep an "advantage to CDK-layered applications" as compared to third-party solutions,

---

[33] *Autoloop* Compl. ¶ 90.
[34] *Autoloop* Compl. ¶ 91.

providing additional "margin" that could be achieved through a "closed" system. *Id.* at 139:2–7.[35]

66. CDK's own documents show that it sought to "disrupt the workflow" of competing applications and services, and of those that compete with CDK's own "service workflow application[s]" in particular. *Authenticom* Dkt. No. 163 at 140:11–141:13. In order to achieve these aims, as CDK's internal documents acknowledged, CDK needed Reynolds' cooperation. In an October 2014 presentation, CDK stated that it needed to enter into "reciprocal agreements with DMS providers," including specifically Reynolds, in order to eliminate competing data integrators. *Id.* at 145:18–146:15. And Reynolds needed CDK to close CDK's system to reduce the number of dealers leaving Reynolds for CDK on the basis of CDK's previously "open" system. Moreover, with the two dominant DMS providers agreeing to block independent integrators, it would be impossible for competing data integrators to survive. CDK thus contemplated reaching an agreement with Reynolds to reduce, and ultimately eliminate, competition for integration to dealer data.[36]

### ii. CDK and Reynolds Agreed To Block Independent Integrators[37]

67. A few months later, in early 2015, CDK and Reynolds entered into agreements designed to eliminate competition in the provision of dealer data integration services. ***First***, in February 2015, CDK and Reynolds entered into three written agreements in which they promised not to compete in providing data

---

[35] *Autoloop* Compl. ¶ 91.

[36] *Autoloop* Compl. ¶ 94.

[37] Plaintiffs do not have access to the written anticompetitive agreements between Reynolds and CDK. Other plaintiffs, however, have alleged the content of those agreements in their complaints (*see, e.g.*, *Authenticom* Compl. ¶¶ 131–39, *Autoloop* Compl. ¶¶ 95–114), and the *Authenticom* court found, as a matter of fact, that Defendants entered into those agreements. 2017 U.S. Dist. LEXIS 109409 at *9-10, 18.

integration services and, in their capacity as providers of proprietary applications and services, not to use the services of independent integration service providers to obtain data from the other's DMS.  **Second**, CDK and Reynolds further agreed that each would block independent integrators' access to their DMS customers' data, in an effort to drive independent integrators from the market entirely.

68.  **Data Exchange Agreement.**  Effective February 18, 2015, CDK and Reynolds entered into three written agreements.   The centerpiece was a so-called "Data Exchange Agreement"—also referred to as a "wind-down" agreement—pursuant to which CDK agreed to wind down its data integration business on the Reynolds DMS, with Reynolds promising not to block CDK's access to the Reynolds system during the wind-down period, which might last as long as five years—until the year 2020.  *See* Data Exchange Agreement § 1.4.  During that period, Reynolds agreed that CDK could continue to extract dealer data just as it had before, using login credentials provided by the dealer.  *See id.* § 4.3.  As for other independent integrators, CDK and Reynolds agreed that they would not "take any steps to assist any person that it reasonably believes to have plans to access or integrate with the other party's DMS."  *Id.* § 4.5.

69.  CDK and Reynolds also agreed that they themselves would no longer access data on each other's DMS.  *Id.*  (agreeing to a "[p]rohibition on . . . DMS Access").  Specifically, the agreement states: "For the avoidance of doubt,  this Section 4.5 is not intended as a 'covenant not to compete,' but rather as a contractual restriction of access and attempted access."  *Id.* This restriction lasts forever.  *See id.* § 6.1.  Reynolds' own top executive confirmed that Section 4.5 prohibits CDK and Reynolds from accessing each other's DMS.  Robert Schaefer, Reynolds' Vice President of Data Services, has testified under oath to the following: "Q: In this contract by its plain term Section 4.5, Reynolds agreed not to access the CDK DMS; isn't that right?  A: That would be correct." *Authenticom* Dkt. No. 163, at 76:6–9.  Mr. Schaefer offered similar sworn testimony with

respect to CDK's prohibition on access of Reynolds' DMS. *Id*. at 73:11–16; 75:16–76:1.

70. Further, the agreement also mandated coordination between the competitors in transitioning all of CDK's vendor clients (*i.e.*, those vendors for which CDK provided access to dealer data on the Reynolds DMS) into the Reynolds RCI program. *See* Data Exchange Agreement § 4.4. In connection with that effort, CDK agreed to give Reynolds full information about the vendors CDK served, including their name, DMS number, store number, branch number, user login, specific data access provided by CDK, data interfaces, the frequency of the data provided, the deadlines for data delivery, the format of the data, and more. *See id.* § 4.3, Exhibit DEA-2. Absent an agreement not to compete, CDK would treat this information as a highly confidential customer trade secret and would not share it with rivals. Indeed, Mr. Schaefer of Reynolds admitted under oath that Reynolds would never share such highly sensitive information with a competitor absent an agreement with that competitor. *Authenticom* Dkt. No. 163, at 80:16–81:5.

71. **Integration Agreements.** Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products—via the 3PA and RCI programs, respectively. Under the agreements, CDK's proprietary products and services could integrate with data on Reynolds DMS's via RCI, and vice versa. Reynolds received five free years of 3PA integration from CDK, while CDK pays for the data integration services from Reynolds. Moreover, by signing up for 3PA, Reynolds agreed that it would integrate with data on CDK's DMS's exclusively through 3PA, and not obtain data for its products and services from anywhere else. CDK agreed to the same in its integration contract with Reynolds for the RCI program.

72. In addition to the written agreements, senior CDK and Reynolds executives have also admitted that they agreed to restrict access to dealer data and destroy data integrators such as Authenticom, SIS, and others. In fact, during a

phone conversation with Steve Cottrell, Authenticom's founder and CEO, in May 2015, Mr. Schaefer of Reynolds said that Reynolds had "made agreements with the other major DMS providers"—there is only CDK—"to support each other's third-party access agreements *and* to block independent integrators such as Authenticom." *Authenticom* Dkt. No. 164, at 139:6–13. Mr. Schaefer said that Reynolds' owner, Bob Brockman, was "adamant" that all third-party data integrators must be cut off. *Id.* As a result, Mr. Schaefer said that Authenticom should wind down its operations and leave the market. *Id.* at 138:3–139:19.

73. A top executive at CDK delivered the same message to Mr. Cottrell. *Id.* at 140:1–143:1. On April 3, 2016, at an industry convention in Las Vegas, Dan McCray (CDK's former Vice President of Product Management) stopped by Authenticom's booth to talk with Mr. Cottrell, who was occupied with a customer. *Id.* After Mr. Cottrell finished with the customer, he walked to CDK's booth, where he saw Mr. McCray "standing off to the side" with "three other individuals." *Id.* After cordial greetings, Mr. McCray took Mr. Cottrell by the arm and said, "Let's take a walk." *Id.* Mr. McCray then confirmed the existence of the illegal agreement, stating that CDK and Reynolds had agreed to "[l]ock you and the other third parties out," and that they were "working collaboratively to remove all hostile integrators from our DMS system." *Id.* at 140:1–143:1. Mr. McCray then grew threatening and stated, "I admire you. I admire your company. I'd really like to see you get something for it before I f*cking destroy it." *Id.* at 142:9–12. Mr. Cottrell rejected Mr. McCray's threats, and insisted that Authenticom would continue to serve its dealer and vendor customers. *See id.* at 142:13–143:1.

74. Upon information and belief, CDK's and Reynolds' conspiracy was formed and implemented by top-level executives at each company. For CDK, the leading actors in the conspiracy include Robert N. Karp, the President of CDK North America and the person with oversight of CDK's 3PA program; Howard

22

Gardner, CDK's Vice President and Manager of Data Strategy and the person who took the lead on the February 2015 agreement; Dan McCray, CDK's recently retired Vice President of Product Management; Ron Workman, CDK's Senior Vice President of Global Corporate Development, who signed the February 2015 agreement; Kevin Distelhorst, CDK's Chief Customer Officer, the founder of IntegraLink, and a former executive at Reynolds; and Malcolm Thorne, CDK's former Chief Global Strategy Officer and the person who took the lead on spearheading the changes to 3PA in 2014 and 2015.

75.     Upon information and belief, for Reynolds, the leading actors in the conspiracy include Bob Brockman, Reynolds' Owner, Chairman, and CEO, and the person who approved and executed the February 2015 agreement and formulated the policy to eliminate competitive data integrators through blocking; and Robert Schaefer, Reynolds' Vice President of OEM Relations, Data Services, and Security—the person in charge of the RCI program.

76.     In the wake of their agreements, CDK and Reynolds have aggressively blocked data integrators and other third parties from accessing their DMS.  By eliminating the use of other data integrators, CDK has required dealers who use CDK's DMS also to use CDK's 3PA service.

## 2.     CDK's and Reynolds' Exclusive Dealing Provisions with Vendors and Dealers

77.     Shortly after entering into the Data Exchange Agreement, CDK began "renegotiating" its contracts with vendors for 3PA access (actually, cancelling existing contracts and forcing vendors like Plaintiffs to sign new contracts). Consistent with its decision to close its DMS, CDK, like Reynolds, imposed exclusive dealing provisions that required vendors to use 3PA alone to integrate with data on CDK DMS for all of their products and services.  CDK also took the new position that, notwithstanding their plain language, its existing contracts with dealers prohibited allowing data integrators to access CDK DMS.

a. **CDK and Reynolds Imposed Exclusive Dealing and Pricing Secrecy Provisions in Their Access Agreements**

78. Plaintiff PartProtection's 3PA contract includes an exclusive dealing provision in Section 1(e): ████████████████████████████

████████████████████████████████████████████████████

(3PA Agreement, attached as Exhibit 1 (emphasis added).) The exclusive dealing provision purports to apply to nearly every PartProtection product and service, so that the use of 3PA for any one of PartProtection's current offerings essentially requires PartProtection to use 3PA for all current and future offerings. If PartProtection breaches this provision by using another data integrator, CDK may terminate the entire agreement. (*Id.* § 4(b).)

79. Reynolds' RCI agreements contain substantially similar provisions and give Reynolds an exclusive right to access dealer data on the Reynolds DMS for purposes of data integration and syndication, to the exclusion of all others. Indeed, a draft RCI agreement sent by Reynolds to PartProtection in 2018, and the parties' RCI agreement from 2014, provide that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (RCI Agreement, attached as Exhibit 2, §§ 1.10, 2.5.3.) Like CDK, Reynolds reserves the right to terminate a vendor's access if it breaches this exclusive dealing provision. (*Id.* § 2.5.3.1.)

80. These exclusive dealing provisions even prohibit Plaintiffs from sharing dealer data between their own products and services because Plaintiffs' solutions cannot receive dealer data from any source other than 3PA or RCI even where each such product or service is separately paying Defendants to access the exact same data. Because Plaintiffs cannot share data between their solutions, they are essentially prohibited from having their solutions work together, and must pull dealer data from the DMS each time it is needed. That is a very inefficient and

highly anticompetitive process.  It also means that Defendants can charge repeatedly for access to the same data in addition to thwarting Plaintiffs' ability to integrate their solutions.

81.  The 3PA and RCI contracts also include price-secrecy provisions. Section 8 of the 3PA agreement provides: ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ (Ex. 1, 3PA Agreement.)  Reynolds' RCI agreements similarly bar counterparties from disclosing Reynolds' ███████████████████ including data integration prices. (Ex. 2, RCI Agreement, ¶¶ 1.3, 2.7.)  In other words, Defendants prevent vendors, such as PartProtection, from disclosing their integration costs to dealerships, even though the vendors frequently pass those costs on to the dealers.

82.  The exclusive dealing    terms  in  PartProtection's  3PA  contract purportedly last forever.  The contract states: ███████████████████
████████████████████████████████████████████████
████████████████████████ (Ex. 1, 3PA Agreement, § 4(a).)  This provision seeks to tie the vendor to the 3PA program indefinitely.  Even if a vendor were to stop participating in the 3PA program, it would still be barred from obtaining data from any CDK dealer from any other source.  That gives CDK carte blanche to raise integration prices once they enter the 3PA program because vendors need integration with data on the CDK DMS.

83.  The 3PA contract also bars PartProtection from indicating that an increase in the price of products or services is related to an increase in the integration fees charged by CDK: ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

25

(*Id*. § 8.)

84.     CDK swiftly and harshly punishes vendors that violate its "price-secrecy" mandate and threaten to expose its supracompetitive pricing to dealers or the public.  For example, in early 2015, TradeMotion and PartProtection developed an exciting business opportunity with Nissan North America ("Nissan") in which Nissan planned to launch a pilot program in which it would expand its contractual relationship with i3 Brands and offer TradeMotion and PartProtection to wholesalers.     TradeMotion and PartProtection believed that, through their contemplated partnership with Nissan, they would substantially expand their customer bases.  To launch the pilot program, they needed to become "certified" by CDK to integrate with CDK's DMS and provide a streamlined workflow based on real-time DMS data.

85.     On March 19, 2015, TradeMotion, PartProtection, CDK, and Nissan personnel participated in a conference call to discuss the pilot program expanding the existing contractual relationship.  Among other topics, the parties discussed the cost to Nissan if Nissan billed the dealers directly for their DMS access or absorbed the cost.  Even though CDK representatives later stated the pilot program was "very appealing," upon determining that Nissan's proposal could take market share from one of CDK's largest customers, CDK looked for a way to derail the project.  To that end, it refused to finalize integration for TradeMotion and PartProtection and terminated TradeMotion's access agreement on the basis that they had disclosed TradeMotion's integration prices to Nissan in breach of its "price secrecy" obligations.  Of course, this was just a thinly veiled attempt by CDK to prevent auto dealers from learning of its supracompetitive prices and sabotage a project that posed a threat to its business.

### b.     The Vendor and Dealer Exclusive Dealing Provisions Are Anticompetitive

86.     The exclusive dealing provisions are independently anticompetitive.

26

They foreclose all competition in the Dealer Data Integration Market for approximately 40% of dealers who use CDK DMS (and an even greater percentage when considered in terms of the number of new cars sold). And they foreclose all competition in the Single-Brand Aftermarket for Dealer Data Integration on Defendants' DMS. From the perspective of vendors, the foreclosure is even more extreme. For example, if a vendor participates in CDK's 3PA program for even a single CDK dealer, that vendor may no longer access any CDK DMS through any means other than through 3PA for any CDK dealer and for any product or service. Reynolds also imposes similar exclusive dealing requirements.[38]

### C. Defendants' Actions Have Harmed Competition

87. CDK's illegal horizontal agreement with Reynolds and its anticompetitive exclusive dealing provisions have severely harmed competition in the Dealer Data Integration Market to the detriment of solutions that rely on data integration services. CDK and Reynolds currently have a monopoly on data integration for their respective DMS. This monopoly has had predictable effects: prices have skyrocketed and quality has stagnated or even decreased. CDK's internal documents candidly explain that this was precisely CDK's goal. It needed to "close" its DMS because otherwise the dramatically increased prices would cause vendors "to move to [other data integrators] instead of accept increase price."[39] *Authenticom* Dkt. No. 163, at 134:6-21.

88. Even though Plaintiffs and other vendors pass through a portion of CDK's and Reynolds' inflated data integration costs to dealers, many vendors (including Plaintiffs) have no choice but to absorb some of the increased data integration fees because dealers are unable or unwilling to pay such excessive fees. This results in slashed development budgets, support, and other investments in their products and services. These cost-cutting measures ultimately reduce the quality of

---

[38] *Autoloop* Compl. ¶ 126.
[39] *Autoloop* Compl. ¶ 127.

such products and services.[40]

89.    The increased data integration prices and reduced quality of data integration services have also "tilted the table" in favor of Defendants' own offerings because their products and services do not have to pay excessive data integration fees, and those solutions have near real-time, read and write integration to all necessary dealer data on the DMS.[41]

90.    Additionally, vendors have had to scale back the functionality of their products and services or pull them off the market entirely. For example, at the *Authenticom* hearing, Alan Andreu of vendor Dominion testified that Dominion had to shutter one application because the cost of integration fees exceeded the cost of the product itself. *Authenticom* Dkt. No. 165, at 35:14–20. Likewise, Michael Korp, owner of the vendor Open Recalls, testified that he could not afford CDK's and Reynolds' high integration prices. *Authenticom* Dkt. No. 162, at 194:6–195:8. He had therefore been forced to rely on Authenticom for integration, but CDK's blocking has forced the vendor to lay off employees and halt plans for growth. *Id.* at 192:3–16.[42]

### 1.    Plaintiffs' and Other Vendors' Data Integration Prices Have Skyrocketed

91.    CDK and Reynolds have drastically increased the prices they charge for their data integration services (3PA and RCI) since 2015. These prices are now far higher than the prices that would exist in a competitive Dealer Data Integration Market.[43]

92.    CDK formally announced a "refreshed" 3PA program on June 22, 2015—just a few months after its collusive agreement with Reynolds—as part of its

---

[40] *Autoloop* Compl. ¶ 128.
[41] *Autoloop* Compl. ¶ 129.
[42] *Autoloop* Compl. ¶ 131.
[43] *Autoloop* Compl. ¶ 132.

"SecurityFirst" initiative. This initiative used data security as the pretext for "closing" the DMS and imposing massive price increases on vendors.[44]

93. Indeed, in March 2015, a CDK representative informed PartProtection that it could integrate with CDK's DMS for a monthly fee of $55–$75, depending on the volume of business conducted by PartProtection. In February 2016 (*i.e.*, after CDK launched its "refreshed" program), CDK raised its price quote to **$139**— approximately 150% greater than the price CDK had quoted PartProtection one year earlier. In April 2016, after PartProtection protested CDK's outrageous demands, the parties agreed upon a price of $██. By April 2017, though, CDK had used its leverage over PartProtection to increase its integration fee to $██ per month. Thus, at a minimum, CDK raised PartProtection's integration price **65%** in the two years after it executed its anticompetitive agreements with Reynolds and "refreshed" its data integration program.

94. After entering into the unlawful 2015 agreement with CDK, Reynolds has also increased its RCI prices far higher than it could if there were any competition. Every year, RCI has increased i3 Brand's prices by approximately four percent. Furthermore, the same year that CDK and Reynolds memorialized their anticompetitive agreement, Reynolds began charging Plaintiffs a fee for each "transaction" between their applications and the Reynolds DMS. In other words, Reynolds now charges Plaintiffs an additional fee every time certain of its applications accesses the DMS. For applications that require frequent communication with the DMS—such as scheduling software—transaction fees alone can cost Plaintiffs hundreds of dollars per dealer per month. Given the combination of Reynolds' exorbitantly high standard integration fees and its transaction fees, many dealers pay more in fees than Plaintiffs charge for their products. Other vendors have seen the cost of integration fees charged by Reynolds

---

[44] *Autoloop* Compl. ¶ 133.

increase by similar margins, and have been forced to pay transaction fees.[45]

95.    Plaintiffs are not alone in being forced to pay these extreme prices.  For example, at the *Authenticom* hearing, a witness for vendor Dominion Enterprises testified that his company paid $30 per dealer per month for data integration with Authenticom, but now is paying CDK $247 for the same service.  *Authenticom* Dkt. 165, at 30:16–25.  At that same hearing, vendor AutoLoop testified that it had paid $160 per dealer per month for 3PA in 2014, which increased to $694 in 2016 and $735 in July 2017.  *Id.* at 61:23–62:21; *see also Authenticom*, 2017 U.S. Dist. LEXIS 109409 at *14 (describing testimony of Dominion and Autoloop relating to CDK's escalating data integration fees).

96.    By increasing Plaintiffs' integration fees so dramatically, Defendants have significantly raised the costs of Plaintiffs' solutions.  Plaintiffs pass on a portion of these integration fees as data integration surcharges, and such surcharges are a substantial percentage of the total monthly cost of their DMS-integrated solutions.

97.    The current 3PA and RCI prices are also much higher than the prices that were charged by competing data integrators prior to CDK's and Reynolds' illegal agreement in 2015.  For example, PartProtection has data integration agreements with other providers under which it pays between $25–55 per month.

### 2.    Defendants' Anticompetitive Conduct Has Tilted the Table in Favor of Their Applications and Interests to the Detriment of Plaintiffs' and Other Vendors' Applications

98.    In addition to raising prices for data integration services to supracompetitive levels, Defendants now provide inferior services to third-party vendors to "tilt the table" in favor of their own interests and applications.  Malcolm Thorne, CDK's former chief strategy officer, has admitted under oath that 3PA "protect[ed] CDK products through a tilt-the-table approach."  *Authenticom* Dkt. No. 163, at 140:11–25.  And CDK's internal documents state that one of the "3PA

---

[45] *Autoloop* Compl. ¶ 138.

Program Principles" is to "[p]rotect CDK Products through a 'tilt-the-table' approach" and to "[k]eep value add advantage to CDK-layered applications." *Id*. at 139:2–140:25.[46]

99.    Defendants restrict Plaintiffs' and other vendors' access to and rights regarding dealer data on their DMS for no reason other than to make their offerings more difficult to use or to reduce the features and functionality of those products, thereby harming Plaintiffs and other vendors, and providing an artificial advantage to Defendants' own competing interests and products.[47]

100.    For example, in February 2015, Ford Motor Company ("Ford") and i3 Brands discussed the possibility that Ford would offer PartProtection to its customers under the private label "Service PartCARE" at thousands of Ford dealerships.  To facilitate the program, Ford needed TradeMotion and PartProtection to complete integrations with its DMS providers, including Reynolds.  But Reynolds, which planned to ultimately purchase TradeMotion and PartProtection, did not want their valuations to increase significantly before an acquisition. Accordingly, Reynolds stalled their integration and ultimately only provided very limited integration.   TradeMotion and PartProtection, having no recourse because of Defendants' duopoly and anticompetitive behavior, were forced to accept whatever integration Reynolds would allow.

101.    In April 2015, Ford even demanded that Reynolds complete integration for TradeMotion and PartProtection so that it could launch the program with its dealers, but Reynolds *still* refused to integrate them.   Although Ford and PartProtection executed a Letter of Intent regarding Service PartCARE in October 2015, Ford ultimately declined to launch the project beyond the pilot because PartProtection and TradeMotion could not obtain the integration they needed from Reynolds. PartProtection and TradeMotion lost out on sales worth potentially

---

[46] *Autoloop* Compl. ¶ 145.
[47] *Autoloop* Compl. ¶ 146.

1    millions of dollars due to Reynolds' actions.

2        102.   As another example of "tilting the table," CDK limits how frequently

3    its applications can send data to, or receive data from, the DMS. Whereas

4    independent integrators like SIS were able to exchange data with the DMS in less

5    than 30 seconds, PartProtection's contract with CDK limits data exchanges to once

6    every 15 minutes. Other vendors experience similar restrictions on their ability to

7    access data in the DMS.   CDK's own applications, however, are able to

8    communicate with the DMS in near-real time.[48]

9        103.   CDK and Reynolds also force Plaintiffs to go through onerous

10   "certification" exercises that serve no purpose other than to provide them with

11   valuable and confidential proprietary information about their products.  They have

12   demanded that Plaintiffs: (a) provide proprietary information about the functionality

13   of their products; (b) conduct live demonstrations of their products during which

14   employees ask detailed questions about their technology; (c) provide a "workflow"

15   model showing how each product uses data; and (d) justify how Plaintiffs' product

16   will use each data element.  On information and belief, Defendants impose similarly

17   invasive certification requirements on other vendors.[49]

18   **D.   Defendants' Anticompetitive Conduct Has No Pro-Competitive**
19   **       Justification**

20       104.   There are no pro-competitive justifications for Defendants'

21   anticompetitive behavior.  CDK and Reynolds have claimed that "closing" their

22   DMS is necessary to protect "data security" because, they assert, other data

23   integrators are "unsecure."  But that is simply not true.[50]

24       105.   *First*, there is nothing unusual or unsecure about third parties

25   integrating with the DMS on the dealer's behalf.  CDK itself owns two data

26

27   ───────────────────
     [48] *Autoloop* Compl. ¶ 149.
28   [49] *Autoloop* Compl. ¶ 150.
     [50] *Autoloop* Compl. ¶ 151.

integrators (DMI and IntegraLink) that interact with and syndicate data in the same way as other data integrators. Malcolm Thorne—CDK's then chief strategy officer—told *Automotive News* in March 2015 that "the pull process of extracting data is as safe as pushing out." David Barkholz, *Dealerships Work To Safeguard Data as Security Breaches Loom*, Automotive News (Mar. 9, 2015). Indeed, until they entered their agreement in February 2015, CDK pulled data using login credentials from Reynolds dealers (and still does today pursuant to the "wind down" agreement). And Reynolds for over a decade consistently allowed third-party access to its DMS. It was only after Mr. Brockman acquired Reynolds in 2006 that it changed its position with respect to competitors' access.[51]

106. **Second**, at the *Authenticom* hearing, CDK was unable to offer a single example of a data-security incident involving any independent data integrator. *See Authenticom*, 2017 U.S. Dist. LEXIS 109409 at *6. Reynolds could cite only a single incident (not involving data security) in which a query became stalled, but the problem was quickly and easily resolved. This is not surprising given that the methods used by third parties to integrate with the DMS are standard methods employed by integrators in multiple industries. The standard methods that work in other industries would work here.[52]

107. **Third**, based on Plaintiffs' experience with Defendants' onerous certification processes, they do not ask any questions actually related to vendors' security practices, such as how it secures data it retrieves from the DMS during transit and storage. Rather, Defendants seek proprietary information about the functionality of software applications provided by vendors such as PartProtection—the type of information one would want to know about a competitor's products in order to gain a competitive advantage against third-party

---

[51] *Autoloop* Compl. ¶ 152.
[52] *Autoloop* Compl. ¶ 155.

vendors.[53]

108.  **Fourth**, the *Authenticom* court even determined that CDK failed to adduce any evidence that the higher prices it charged for data integration improved "security."  2017 U.S. Dist. LEXIS 109409 at *23 ("Defendants explain that the costs are justified because they undertake the burden of maintaining the DMS and preserving its security. I am not persuaded . . . .").

109.  **Finally**, Defendants' actions show that their commitment to "security" is questionable, at best.  For example, after Reynolds purchased Parts.com and TradeMotion from i3 Brands in 2017, it inexplicably cancelled their subscription to an online security program called HackmyCF, which cost just $100 per month.  Sure enough, on July 27, 2018, TradeMotion, under the ownership of Reynolds, sent out a letter to customers informing them that it had experienced a *data breach* on five separate occasions between October 2017 and May 2018.   Similarly, Mr. Brockman's personal website, "http://bobbrockman.com," is an *unsecure* webpage (*i.e.*, the data on it is not encrypted, as it would be on a secure "https" website) that is *hosted by Reynolds*, making it potentially vulnerable to attack.  At the *Authenticom* hearing, a representative of the vendor, Dominion Dealer Solutions, also opined that Reynolds' methods are "comically" and "horribly insecure." *Authenticom* Dkt. 165, at 43:5–14.

## II.  i3 BRANDS' BUSINESSES SUFFER AS A RESULT OF DEFENDANTS' ANTICOMPETITIVE AGREEMENTS

110.  As described above, CDK and Reynolds have damaged Plaintiffs and other vendors through their anticompetitive agreements and by charging vendors supracompetitive integration fees.  Since Defendants memorialized their anticompetitive agreements, though, Reynolds has also harmed Plaintiffs in other capacities as well.  **First**, Defendants' anticompetitive behavior substantially

---

[53] *Autoloop* Compl. ¶ 157.

depressed the value of i3 Brands' businesses, and forced i3 Brands to sell Parts.com and TradeMotion to Reynolds at artificially low prices. **Second**, Reynolds used its monopolistic leverage to lure PartProtection into an illusory "partnership" and then steal PartProtection's confidential and proprietary information to start a competing product it hopes will drive PartProtection out of business.

### A. i3 Brands Is Forced To Sell Parts.com and TradeMotion at a Substantially Discounted Price

111. In November 2015, Reynolds approached i3 Brands about the possibility of acquiring TradeMotion and Parts.com. Based in substantial part on the outrageous integration fees Defendants charged Parts.com and TradeMotion (for which i3 Brands had no recourse), i3 Brands had concerns about the long-term viability of Parts.com and TradeMotion. Accordingly, it engaged in discussions with Reynolds in the ensuing months concerning a potential transaction.

112. On January 13, 2017, Reynolds formally offered to purchase the assets of TradeMotion, Parts.com, and the trade name, "PartShield," for $▮ million. Reynolds' offer was based on a valuation methodology that incorporated a multiple of the earnings of TradeMotion and Parts.com in the previous year. i3 Brands attempted to negotiate a higher price for its businesses, but Reynolds refused to increase its offer. Based in large part on its increasing data integration costs, i3 Brands had no choice but to sell its businesses to Reynolds at the offered price. Thus, in April 2017, it sold Parts.com and TradeMotion to Reynolds for $▮ million and decided to focus on PartProtection.

113. As i3 Brands would later learn after it sold its businesses to Reynolds, the pressure it felt to sell Parts.com and TradeMotion was actually a consequence of Defendants' nefarious actions, and those actions substantially drove down the value of its businesses. **First**, Defendants' clandestine conspiracy to eliminate all competition in the data integration market since 2015 had been forcing i3 Brands to pay inflated prices dictated by Defendants rather than the market. Those heightened

35

costs substantially reduced the earnings of Parts.com and TradeMotion, and, necessarily, their business valuations. **Second**, Defendants' conspiracy gave Reynolds the leverage it needed to shut down TradeMotion's potentially lucrative business opportunity with Ford and keep TradeMotion's valuation from increasing. **Finally**, Reynolds diminished the value of TradeMotion by acquiring businesses that competed with it even though Reynolds had agreed to promote TradeMotion's product and not competing products.

### 1. The Value of i3 Brand's Assets Was Substantially Reduced By Defendants' Undisclosed Anticompetitive Agreements

114. As described above, TradeMotion and Parts.com each must access a DMS owned and maintained by Reynolds or CDK to operate their respective businesses. Thus, the integration costs they pay to access those DMS substantially influence their earnings and profit margins. Based on Defendants' conspiracy, i3 Brands (and its businesses) incurred much higher integration costs than they otherwise would have incurred in a competitive marketplace, and those artificially inflated integration costs drove down the earnings of Parts.com and TradeMotion, and, in turn, drove down their enterprise values.

115. Even in instances where i3 Brands was able to pass through its integration costs to customers, the prices they charged were higher than they otherwise would have been had the data integration market been competitive. Accordingly, upon information and belief, customer demand for the services of TradeMotion and Parts.com was artificially low as a result of Defendants' anticompetitive conduct, which reduced the revenue and profits generated by those businesses. Thus, Defendants' misconduct hurt TradeMotion and Parts.com's market share and earnings, and also reduced their enterprise values.

116. Moreover, as described above, while Defendants charged vendors supracompetitive prices for access to their DMS, they also "tilted the table" in favor of their own products and interests. As one example, Defendants incurred minimal

36

data integration fees for their own products, but charged Plaintiffs (and other vendors) bloated integration fees for products that competed with Plaintiffs' products. Based on this illegal competitive advantage, Reynolds and CDK were able to capture market share for their applications that, in a competitive market, would have been captured by other vendors, including Parts.com and TradeMotion. Thus, Defendants' "tilt the table" tactics reduced the value of Parts.com and TradeMotion.

117. Defendants' duopoly and anticompetitive behavior also positioned them to act as "gatekeepers" that could eliminate competition by simply refusing to provide integration to vendors. In fact, as described above, Reynolds deliberately sabotaged i3 Brands' pilot program with Ford because it knew that the program was a lucrative opportunity for TradeMotion and PartProtection and, based on its interest in purchasing those brands at a low price, it did not want them to become more valuable. (*See* Section (I)(c)(2), *supra*, at ¶¶ 100–101.) By using its control of the marketplace to sabotage that opportunity with Ford, Reynolds prevented TradeMotion from recognizing additional earnings and decreased its enterprise valuation.

### 2. Reynolds Also Decreased the Value of TradeMotion By Breaching the Parties' Reseller Agreement

118. Reynolds also lowered the value of TradeMotion by blatantly breaching a non-compete agreement in a "Reseller Agreement" between Reynolds and TradeMotion.

119. In 2004, TradeMotion and Reynolds entered into their first of several Reseller Agreements under which Reynolds agreed to act as an independent sales agent of TradeMotion for the promotion and marketing of TradeMotion's solutions to automobile dealers and/or dealer groups. TradeMotion and Reynolds renewed their agreement every two to three years, including for the periods June 2014–June 2016 and June 2016–June 2018.

120. Under the Reseller Agreement, Reynolds agreed that it would

37

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ (Reseller Agreement, attached as Exhibit 3, at

3.) Naturally, to avoid a conflict of interest, Reynolds also agreed that it would ████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ (*Id.* at 10.)

121. Reynolds nevertheless purchased *two* entities that competed with TradeMotion during the period in which it had coveted not to offer any rival eCommerce solutions. Most pertinently, in January 2014, it purchased AddOnAuto, which directly competed with TradeMotion in that it provided auto dealers with online catalogs that streamlined the process of purchasing auto parts. In fact, according to a news release dated January 24, 2014, Sidney Haider, now a Reynolds Vice President, stated that AddOnAuto's technology "redefined electronic shopping for vehicle accessories."

122. By acquiring and operating AddOnAuto, Reynolds not only breached the non-compete provision in the Reseller Agreement, but also usurped business opportunities that would have been available to TradeMotion had Reynolds acted as a loyal agent. In fact, once Reynolds acquired AddOnAuto, it promoted TradeMotion far less and TradeMotion's revenues fell considerably. Further, in October 2018, Reynolds reported that 125 dealerships that used AddOnAuto had sold a total of *$56 million* of accessories in 2017. Thus, not only did Reynolds depress the value of TradeMotion through its anticompetitive conspiracy with CDK, it also reduced the value of TradeMotion through its blatant breach of its covenant not to compete with TradeMotion in the Reseller Agreement.

123. Defendants' misconduct significantly diminished the earnings of TradeMotion and Parts.com, which put artificial pressure on i3 Brands to sell those

entities, and ultimately forced i3 Brands to sell them for millions less than they would have been worth but for Defendants' conspiracy.

### B.    Reynolds Steals PartProtection from i3 Brands

124.   In perhaps the most egregious example of "tilting the table," Reynolds not only sought to disadvantage PartProtection through its anticompetitive behavior, but devised and executed a scheme to steal its trade secrets and create a competing product derived those trade secrets that Reynolds hopes will drive PartProtection out of business.

125.   In 2015, PartProtection was a brand new internet-based concept through which purchasers of automobiles could purchase extended warranties on their OEM parts, and Reynolds saw great potential in that business.  In fact, a Reynolds executive stated at a meeting with Mr. Lucas that PartProtection was the best product he had seen in the 30 years he had worked with Reynolds CEO, Bob Brockman.  Reynolds expressed interest in purchasing PartProtection from i3 Brands, but i3 Brands refused to sell because it believed that PartProtection would become a very successful enterprise in the coming years.

126.   Frustrated that i3 Brands would not sell PartProtection, Reynolds concocted a multi-step scheme to *steal* PartProtection from i3 Brands.  *First*, it lured Plaintiffs into an agreement under which Reynolds would promote PartProtection at dealerships that used its DMS and pay PartProtection a royalty for every policy issued at those dealerships.  *Second*, having established a relationship of trust with PartProtection, Reynolds persuaded Plaintiffs that it needed to access all of PartProtection's trade secrets and confidential information to promote PartProtection at its dealerships.  *Finally*, after Reynolds procured PartProtection's trade secrets through dishonest and improper means, it used them to create a competing product through which it intends to put PartProtection out of business and capture the entire market for itself.

### 1. Reynolds Executes a Partnership Agreement with PartProtection

127.  The first component of Reynolds' scheme was to lure PartProtection into a partnership agreement.  To that end, in early 2017, Reynolds offered to promote PartProtection in dealerships that used its DMS and pay PartProtection a substantial royalty for every policy that those dealerships sold through PartProtection.  i3 Brands was excited about this opportunity, which it projected would generate annual profits in the millions for PartProtection.  Thus, it accepted Reynolds' offer.

128.  By August 2017, the parties began to take steps to effectuate their partnership agreement.  Specifically, to ultimately deploy PartProtection, Reynolds needed to access PartProtection's source code so it could integrate PartProtection into its platform.  Accordingly, in reliance on the parties' partnership agreement, and with the understanding that its confidential, proprietary, and trade secret information would be kept confidential by Reynolds, PartProtection permitted Reynolds to access its source code.

129.  On October 6, 2017, after i3 Brands executed a buyout agreement with PartProtection's other shareholder, C&K Auto, for its shares of PartProtection, i3 Brands and Reynolds reduced their partnership agreement to writing.  Unbeknownst to i3 Brands, however, Reynolds had already removed PartProtection's source code from its applications in September 2017.  Thus, even though Reynolds entered into a written agreement with PartProtection, it clearly had no intention of actually promoting PartProtection's product.

130.  The written agreement was titled "Agreement of Basic Terms" ("ABT").  After the parties exchanged drafts of the ABT, Matt Zachary, a business analyst at Reynolds sent i3 Brands an "*execution version* with changes accepted." Sidney Haider, Reynolds' Vice President, also informed i3 Brands that he approved of the ABT.

131. The ABT, as approved by Reynolds, provided that Reynolds would pay PartProtection the following fees for each policy that PartProtection originated:

- No Fee for covered parts and/or labor up to $50.00 in repair or invoice value, excluding wearable parts policies;

- $.50 (fifty cents) per covered parts and/or labor from $50.01 to $250.00 in repair or invoice value, excluding wearable parts polices;

- $1.00 per covered parts and/or labor from $250.01 to $500.00 in repair or invoice value, excluding wearable parts policies;

- $2.00 per covered parts and/or labor from $500.01 and above in repair or invoice value, excluding wearbable parts policies;

- $1.50 for each battery policy; and

- $2.00 for each brakes and rotor policy (policy is per axle).

(Agreement of Basic Terms, attached as Exhibit 4.)

132. Based on the parties' projections, i3 Brands would have earned anywhere from $4–6 million per year based on PartProtection policies originated by Reynolds. Moreover, i3 Brands, in part consideration for Reynolds' promise to promote the PartProtection product, gave Reynolds a Right of First Refusal to purchase PartProtection for the following *thirty years*. Based on that agreement, i3 Brands anticipated that its projected profit stream would continue throughout that period, or at least until Reynolds purchased PartProtection. Thus, based on agreements with Reynolds, Plaintiffs understood and expected that PartProtection would become a lucrative and profitable enterprise based on its agreement with Reynolds, alone.

## 2. Reynolds Misappropriates PartProtection's Trade Secrets

133. For Reynolds, the partnership with Plaintiff was just a vehicle through which it intended to improperly access all of PartProtection's confidential, proprietary, and trade secret information and then use that information to create a competitor to harm PartProtection and drive it out of the market. Reynolds carefully planned and executed this scheme to steal PartProtection's business as follows.

134. The parties had contemplated that Reynolds would promote PartProtection under the "PartShield" name. Thus, in furtherance of its scheme, as soon as i3 Brands acquired complete control of PartProtection, Reynolds had i3 Brands sign an "Acknowledgement" that (i) PartShield has "common characteristics with i3 Brands' PartProtection product," and (ii) former i3 Brands employees now employed by Reynolds could share PartProtection's confidential, proprietary, and trade secret information with Reynolds. (Acknowledgment, attached as Exhibit 5.) Although the Acknowledgment appeared to be a mere formality to protect Reynolds while it developed PartShield, Reynolds deceptively used it as a cover to access PartProtection's confidential, proprietary, and trade secret information without arousing suspicion from Plaintiffs.

135. After procuring the Acknowledgement, Reynolds executives and employees gathered intelligence about PartProtection from i3 Brands' former employees. PartProtection, operating under the belief that its "partner," Reynolds, merely requested this information to convert PartProtection in to PartShield, provided Reynolds with confidential, proprietary, and trade secret information. Among other confidential information, Reynolds accessed (based on false pretenses):

- All of PartProtection's proprietary source code for its software;

- PartProtection's "eligibility file," which took years of research and development, containing PartProtection's confidential database of warranties it could offer for various auto parts and the prices of the covered auto parts; and

- PartProtection's confidential contracts with the companies that agreed to underwrite the policies issued by PartProtection.

136. But, as Plaintiffs would later learn, Reynolds did not use PartProtection's proprietary information in good faith to promote PartProtection (or PartShield). Instead, Reynolds used this information to construct a substantially similar product that it intends to market under the name, "ReyShield." Reynolds used PartProtection's source code to build out the platform for "ReyShield." It also

used PartProtection's "eligibility file" as a guide for the warranties it intends to offer customers, and to create a business plan for its competing product. None of its uses were permitted under its agreements with Plaintiffs. Finally, after viewing PartProtection's confidential underwriter agreements, it *contacted those underwriters* and offered them contracts that were more favorable to them than their agreements with PartProtection. Reynolds took all of these actions with the goal of creating a competitor to PartProtection in an expedited manner and to put PartProtection out of business—all in violation of its agreements with Plaintiffs.

137. Reynolds even recently hired PartProtection's former Vice President of Sales, Darren Forster, who knows all of the intricacies of PartProtection's business. Upon information and belief, it hired Mr. Forster to help launch its product that will compete with PartProtection and usurp business opportunities from PartProtection.

138. Reynolds has not taken its competing product to market yet, but even if only a majority of dealerships in business with Reynolds adopt it, it is estimated to be worth *hundreds of millions* of dollars.

139. By making use of PartProtection's confidential and proprietary information and trade secrets, Reynolds was spared the expense of conducting its own research and development. As noted above, Plaintiffs spent years developing the PartProtection product and Reynolds has taken advantage of all of Plaintiffs' hard work and been unjustly enriched.

140. Reynolds has violated its agreement to promote PartProtection and, in fact, has refused to integrate PartProtection in its DMS. For example, Reynolds Vice President, Sidney Haider, even informed Mr. Lucas on October 31, 2018 that: (i) Reynolds would not abide by the ABT, or any prior agreement to partner with PartProtection; (ii) Reynolds saw tremendous value in PartProtection's product, but it intended to capture that value through its own competing product, which Mr. Haider referred to as "ReyShield"; and (iii) PartProtection should try to integrate with CDK's DMS instead. Of course, even if PartProtection could integrate with

43

CDK, it could not realistically compete with ReyShield. That is because ReyShield would be able to offer lower prices because it would not need to pay integration fees and it would benefit from other competitive advantages derived from Defendants' anticompetitive conspiracy.

141. Plaintiffs have and will continue to be irreparably harmed when Reynolds officially launches its competing product—a product that it created with PartProtection's confidential, proprietary, and trade secret information. Plaintiffs have also suffered millions of dollars in damages based on Reynolds' improper conduct.

## COUNT I (CDK and Reynolds):
## HORIZONTAL CONSPIRACY IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT

142. Plaintiffs incorporate by reference the preceding allegations.

143. CDK and Reynolds entered into and engaged in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

144. CDK and Reynolds are horizontal competitors of one another in the DMS market and the Dealer Data Integration Market.

145. The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, or concerted action to eliminate competition in the DMS market, the Dealer Data Integration Market and their respective brand-specific aftermarkets. In furtherance of that conspiracy, in February 2015, CDK and Reynolds entered into a written agreement pursuant to which they agreed to "close" their DMS and not to compete in the Dealer Data Integration Market. CDK and Reynolds also engaged in a group boycott to block all third-party access to their respective DMS. The agreement not to compete between CDK and Reynolds is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

44

146.   The purposes of the conspiracy between CDK and Reynolds include (i) to protect their DMS duopoly (thereby protecting their monopoly profits); (ii) to protect their standalone applications; and (iii) to monopolize the DMS Market and Dealer Data Integration Market so that they can reap monopoly profits.

147.   Through their conspiracy, CDK and Reynolds have caused actual injury to competition for applications and in the DMS Market, the Dealer Data Integration Market and respective aftermarkets.

148.   The CDK and Reynolds agreement has cut off access to dealer data that solution providers need in order to compete with CDK and Reynolds.

149.   CDK and Reynolds possess dominant positions in the DMS market, which they have used to further the conspiracy.

150.   CDK's and Reynolds' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in any market.  On the contrary, their conduct has produced only anticompetitive effects.

151.   As a proximate result of CDK's and Reynolds' unlawful conduct, for which they are jointly and severally liable, Plaintiffs have suffered injury to their business or property in an amount to be proven at trial and automatically trebled.

## COUNT II (CDK and Reynolds):
## UNLAWFUL RESTRAINT OF TRADE IN VIOLATION OF
## SECTION 1 OF THE SHERMAN ACT

152.   Plaintiffs incorporate by reference the preceding allegations.

153.   CDK and Reynolds entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrict trade or commerce in violation of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

154.   CDK and Reynolds' contracts with dealers provide that dealers cannot provide any third parties with access to the DMS.  Likewise, the contracts with vendors provide that vendors cannot access the DMS except through 3PA and RCI.

45

These provisions are standard throughout CDK and Reynolds' contracts with dealers and vendors.

155. CDK and Reynolds were able to impose these exclusive dealing provisions on dealers and vendors as a result of their market power in the DMS market and the respective dealer data integration aftermarket.

156. Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition, they are *per se* illegal. Nevertheless, whether entered into pursuant to CDK's agreement with Reynolds or independently, their vertical restraints are unlawful because they have led to increased prices and reduced output.

157. Through their exclusive dealing provisions, CDK and Reynolds have injured competition in the DMS and Dealer Data Integration markets.

158. CDK and Reynolds' exclusive dealing agreements do not enhance efficiency or competition in any market. On the contrary, the agreements have produced only anticompetitive effects.

159. As a proximate result of CDK and Reynolds' unlawful conduct, Plaintiffs have suffered injury to their business or property in an amount to be proved at trial and automatically trebled.

## COUNT III (CDK and Reynolds):

## UNLAWFUL MONOPOLIZATION IN VIOLATION OF

## SECTION 2 OF THE SHERMAN ACT

160. Plaintiffs incorporate by reference the preceding allegations.

161. CDK and Reynolds have unlawfully monopolized the aftermarket for dealer data integration services with respect to dealer data stored on the CDK DMS, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

162. When dealers purchase DMS services from CDK, they are "locked in" to that purchase through a long-term contractual relationship and high switching and information costs.

163.   Because of customer lock-in in the primary DMS market, CDK and Reynolds have monopoly power—and in fact have monopolized—the Dealer Data Integration aftermarket on their DMS platforms.   CDK and Reynolds have demonstrated their ability to control prices and exclude competition by blocking third-party access to their DMS by raising data access fees to supracompetitive levels.

164.   CDK and Reynolds used anticompetitive means to acquire and maintain their monopoly, including, *inter alia*, by blocking third-party access to the DMS, entering into an agreement pursuant to which they agreed that neither DMS provider would provide third-party access to the other's DMS, and imposing anticompetitive exclusive dealing arrangements on vendors and dealers.

165.   As a direct and proximate result of CDK and Reynolds' monopolization, Plaintiffs have suffered damage to their business or property in an amount to be proven at trial and automatically trebled.

### COUNT IV (CDK and Reynolds):
### VIOLATION OF THE CARTWRIGHT ACT

166.   Plaintiffs incorporate by reference the preceding allegations.

167.   CDK and Reynolds engaged in a conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations.  This conspiracy is a *per se* violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.  CDK's and Reynolds' exclusive dealing requirements are also unlawful under the Cartwright Act.

168.   A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California—where numerous dealers and Plaintiffs are located—and harm to Plaintiffs, car dealers, and car buyers was suffered in California.

169.   As a direct and proximate result of CDK and Reynolds' unlawful

47

conduct, Plaintiffs have suffered injury to their business or property. Plaintiffs are entitled to treble damages for the violations of the Cartwright act alleged herein.

## COUNT V (CDK and Reynolds):
## UNFAIR PRACTICES IN VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

170. Plaintiffs incorporate by reference the preceding allegations.

171. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include, among other things, any "unfair . . . business act or practice."

172. CDK and Reynolds have engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and common law, including the tort of interference with prospective economic relations..

173. CDK and Reynolds' acts and practices as alleged herein have been "unfair" under the UCL. Defendants' conduct—for instance, their "tilt-the-table approach" in placing anticompetitive restrictions on competing services and products that they do not place on their own corresponding solutions—has violated the policy and spirit of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720) and significantly threatened and harmed competition for data integration services and among the products and services that rely on those services. Furthermore, any utility from CDK and Reynolds' conduct does not outweigh the harm it causes to competitors, car dealers, and car buyers.

174. A substantial portion of the unfair acts and practices alleged herein occurred in California and the harm to application providers, car dealers, and car buyers was inflicted in California, for all the reasons set forth in the preceding allegations.

175. As a direct and proximate result of CDK and Reynolds' unfair conduct,

Plaintiffs have suffered injury to their business or property. Plaintiffs are entitled to restitution in an amount to be proven at trial.

**COUNT VI (Reynolds):**

**BREACH OF CONTRACT**

176. Plaintiffs incorporate by reference the preceding allegations.

177. In mid-2017, Reynolds and PartProtection reached an agreement under which Reynolds would promote PartProtection's services to auto dealerships that used Reynolds' DMS under the product name, "PartShield," and pay PartProtection a royalty for each policy that it sold through that product.

178. After PartProtection acquired all outstanding shares of PartProtection on October 6, 2017, PartProtection and Reynolds sought to put certain terms of the agreement in writing. On October 6, 2017, Mr. Zachary, a Reynolds representative, sent i3 Brands an "execution version" of an Agreement of Basic Terms, which Reynolds Vice President, Sidney Haider, approved. That agreement contained terms for Reynolds to promote the PartProtection product (as "PartShield") and a schedule providing the royalties that Reynolds would pay PartProtection for every policy generated by that product.

179. Mr. Lucas accepted Reynold's offer on behalf of i3 Brands and PartProtection by signing the "execution version" of the Agreement of Basic Terms and sending it to Reynolds.

180. The Agreement of Basic Terms is an enforceable contract.

181. Plaintiffs performed all of their obligations under the Agreement of Basic Terms.

182. Reynolds has breached the Agreement of Basic Terms by failing to promote PartProtection (as "PartShield") to Reynolds auto dealerships and by misappropriating PartProtection's confidential, proprietary, and trade secret information to create its own competing product.

183. As a proximate result of Reynolds' breach of contract, Plaintiffs have

49

suffered injury to their business or property in an amount to be proven at trial.

## COUNT VII (Reynolds):

## PROMISSORY ESTOPPEL

184.   Plaintiffs incorporate by reference the preceding allegations.

185.   In 2017, Reynolds promised it would promote PartProtection's services to auto dealerships that used Reynolds' DMS under the product name "PartShield," and pay PartProtection a royalty for each policy that it sold through that product.

186.   Mr. Zachary, a Reynolds representative, sent i3 Brands an "execution version" of an Agreement of Basic Terms, which Mr. Haider approved, that reflected the specific terms of Reynolds' promise to promote the PartProtection product (as "PartShield") and a schedule providing the royalties that Reynolds would pay PartProtection for every policy generated by that product.

187.   i3 Brands reasonably relied upon Reynolds' promise to its detriment when it provided PartProtection's source code to Reynolds and when it executed the "Acknowledgment" that permitted Reynolds to access PartProtection's confidential, proprietary, and trade secret information to fulfill its promise to promote PartProtection.

188.   Reynolds failed to fulfill its promise to partner with PartProtection and promote its products.   In fact, instead of promoting PartProtection, it stole PartProtection's confidential, proprietary, and trade secret information to create a competing product.

189.   As a proximate result of Reynolds' acts, Plaintiffs have suffered injury to their business or property in an amount to be proven at trial.

## COUNT VIII (Reynolds):

## FRAUD

190.   Plaintiffs incorporate by reference the preceding allegations.

191.   Reynolds knowingly misrepresented to Plaintiffs that it would promote PartProtection's services to auto dealerships that used Reynolds' DMS under the

product name, "PartShield," and pay PartProtection a royalty for each policy that it sold through that product, and knowingly omitted the material fact that it actually intended to lure PartProtection into a "partnership" agreement so it could steal PartProtection's confidential, proprietary, and trade secret information to create a competitor to PartProtection.

192. Reynolds knowingly misrepresented to Plaintiffs that it needed to access PartProtection's confidential and proprietary information to effectuate its partnership agreement with PartProtection, and knowingly omitted the material fact that, upon procuring access to PartProtection's trade secrets, it actually intended to steal PartProtection's confidential, proprietary and trade secret information to create a competitor to PartProtection.

193. Plaintiffs justifiably relied to their detriment upon Reynolds' false statements and misrepresentations because they reasonably believed that Reynolds intended to partner with PartProtection and promote it to dealerships.

194. As a proximate result of Reynolds' acts, Plaintiffs have suffered injury to their business or property in an amount to be proven at trial.

**COUNT IX (Reynolds):**

**TRADE SECRET MISAPPROPRIATION IN VIOLATION OF**

**CAL. CIVIL CODE § 3246**

195. Plaintiffs incorporate by reference the preceding allegations.

196. As set forth above, Reynolds has misappropriated and used Plaintiffs' trade secrets, including without limitation information related to PartProtection's proprietary design, proprietary software, business models, eligibility files for auto parts, and underwriting contracts.

197. Reynolds represented to i3 Brands that, to effectuate the parties' partnership agreement, it needed to access the confidential, proprietary, and trade secret information of PartProtection. Reynolds understood that this information would be kept secret.

198. To that end, Plaintiffs signed an "Acknowledgment" that permitted Reynolds to access PartProtection's confidential, proprietary, and trade secret information.

199. In reliance upon Reynolds' representations that it needed to access PartProtection's confidential, proprietary, and trade secret information to effectuate the parties' partnership agreement, PartProtection allowed Reynolds to access this information.

200. Reynolds improperly acquired PartProtection's confidential, proprietary, and trade secret information by interviewing former i3 Brands employees who worked for Reynolds and accessing and analyzing the trade secret information of PartProtection. Among other PartProtection trade secrets, Reynolds accessed:

- All of PartProtection's proprietary source code for its software;

- PartProtection's "eligibility file," which took years to build, and contained PartProtection's confidential database of auto parts that it could insure and the prices of those parts; and

- PartProtection's confidential contracts with the companies that agreed to underwrite the policies issued by PartProtection.

201. Reynolds acquired these trade secrets belonging to PartProtection through improper means, including but not limited to its violations of its duties and agreements with Plaintiffs. Reynolds was fully aware that the information comprising Plaintiffs' trade secrets were secret, confidential and maintained in such a way to prevent disclosure to third parties, and specifically to competitors.

202. Without Plaintiffs' knowledge or consent, Reynolds used PartProtection's confidential, proprietary, and trade secret information to create a competing product.

203. PartProtection took reasonable steps to maintain the secrecy of its trade secret and proprietary information, including by storing its trade secret and proprietary information in secure databases only accessible with confidential log-in

credentials. PartProtection also maintained the confidentiality of its agreements with its underwriters, which Reynolds accessed through fraudulent pretenses and used to create a competing product.

204. Plaintiffs' trade secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from their disclosure or use.

205. As a proximate result of Reynolds' acts, Plaintiffs will suffer irreparable harm and have suffered injury to their business or property in an amount to be proven at trial.

206. Reynolds' actions were willful and malicious. Further, upon information and belief, Reynolds' scheme to steal PartProtection's trade secrets was conducted at the direction of its Vice President, Sidney Haider, who informed Mr. Lucas that Reynolds (i) had no intention of fulfilling its agreement to partner with PartProtection, and (ii) intended to capture PartProtection's prospective corporate opportunities through its own product, "ReyShield," which it had engineered to compete with PartProtection. Upon information and belief, Mr. Haider either directed Reynolds to misappropriate PartProtection's trade secrets or, with knowledge that it misappropriated PartProtection's trade secrets, consciously disregarded those actions or ratified them. Upon information and belief, Reynolds also acted at the direction of its CEO, Bob Brockman, and its Senior Vice President, Robert Burnett, when it effectuated its scheme to misappropriate PartProtection's trade secrets, or they had knowledge of Reynolds' scheme and either consciously disregarded its actions or ratified them. Accordingly, Plaintiffs are entitled to exemplary damages for Reynolds' acts of misappropriation.

## COUNT X (Reynolds):
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

207. Plaintiffs incorporate by reference the preceding allegations.

208. In 2015, Plaintiffs and Ford had an economic relationship that was likely to benefit Plaintiffs. Specifically, Ford and PartProtection discussed the possibility that Ford would offer its customers PartProtection at thousands of Ford dealerships.

209. Reynolds possessed knowledge that Plaintiffs and Ford were in the process of discussing that Ford would offer its customers PartProtection at thousands of Ford dealerships.

210. Because PartProtection competed with products offered by Reynolds, Reynolds stalled PartProtection's integration and ultimately refused to integrate PartProtection altogether. Reynolds refused to provide integration to PartProtection with the intent to sabotage PartProtection's opportunity with Ford and ensure that its own competing products maintained an advantage over PartProtection.

211. Reynolds' conduct was wrongful independent of the interference, itself, because it was done pursuant to Reynolds' illegal conspiracy to drive all competition out of the data integration market. Indeed, Reynolds was only able to derail Plaintiffs' business opportunity with Ford because of its anticompetitive control of the data integration market.

212. Reynolds stalled PartProtection's integration and ultimately refused to integrate PartProtection with the intent to disrupt the economic relationship between Plaintiffs and Ford and with the knowledge that disruption was likely because of Reynolds' conduct.

213. As a result of Reynolds' stalling PartProtection's integration and refusal to integrate PartProtection, the relationship between Plaintiffs and Ford was disrupted. Specifically, as a result of Reynolds' actions, Ford ultimately declined to launch PartProtection to its dealers and PartProtection lost out on sales worth potentially millions of dollars.

214. As a result of Reynolds' stalling PartProtection's integration and refusal to integrate PartProtection, Plaintiffs were harmed in an amount to be

determined at trial.

215. Reynolds' stalling of PartProtection's integration and refusal to integrate PartProtection directly and proximately caused the harm suffered by Plaintiffs.

**COUNT XI (CDK):**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

216. Plaintiffs incorporate by reference the preceding allegations.

217. In early 2015, PartProtection developed a business opportunity with Nissan under which Nissan would launch a pilot program in which it would expand its contractual relationship with i3 Brands and offer TradeMotion and PartProtection to wholesalers. This project was likely to benefit Plaintiffs by expanding PartProtection's customer base.

218. CDK possessed knowledge of the relationship and opportunity between PartProtection and Nissan. Specifically, in order to launch the pilot program, PartProtection needed to become "certified" by CDK in order to integrate with CDK's DMS and provide a streamlined workflow based on real-time DMS data.

219. Upon learning that Nissan and PartProtection intended to launch a project that could harm CDK's interests, CDK refused to finalize integration to PartProtection and terminated Plaintiffs' access agreement.

220. CDK refused to provide integration to PartProtection and terminated Plaintiffs' access agreement because it did not want Plaintiffs to infringe upon one of its largest customer's business interests and with the intent of disrupting the economic relationship between PartProtection and Nissan, with knowledge that disruption was likely because of its conduct.

221. CDK's conduct was wrongful independent of the interference, itself, because it was done pursuant to CDK's illegal conspiracy to drive all competition out of the data integration market. Indeed, CDK was only able to derail Plaintiffs'

business opportunity with Nissan because it had reached anticompetitive agreements with Reynolds concerning the data integration market.

222. As a proximate result of CDK's conduct, the relationship between Nissan and PartProtection was disrupted.

223. As a proximate result of CDK's conduct and the disrupted relationship between Nissan and PartProtection, PartProtection suffered harm in an amount to be determined at trial.

224. CDK's refusal to provide integration to PartProtection and termination of Plaintiffs' access agreement directly and proximately caused the harm suffered by PartProtection.

## JURY DEMAND

225. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

(a)   decree that CDK and Reynolds entered into an unlawful horizontal conspiracy in violation of Section 1 of the Sherman Act;

(b)   decree that the exclusive dealing provisions in CDK's and Reynolds' contracts with Plaintiffs, other vendors, and dealers are anticompetitive and illegal restrictions of trade under Section 1 of the Sherman Act;

(c)   decree that CDK and Reynolds have illegally monopolized the market for integration services for dealer data stored on its DMS platform under Section 2 of the Sherman Act;

(d)   enjoin the enforcement of the exclusive dealing provisions in CDK and Reynolds' contracts with dealers and vendors;

(e)   enjoin CDK and Reynolds from privileging their own products and services— as compared to other vendors' products and services—with respect to integration with data elements stored on mutual dealer

56

clients' DMS, including with respect to data access and usage rights, and bi-directional integration;

(f) award Plaintiffs damages, as provided under the Sherman Act and the Cartwright Act, in an amount to be trebled in accordance with the Sherman Act and the Cartwright Act;

(g) award Plaintiffs damages, as provided under Cal. Civ. Code § 3426, *et seq.*, for Plaintiffs' actual loss and Reynolds' unjust enrichment as a result of Reynolds' misappropriation of PartProtection's trade secrets;

(h) enter a preliminary injunction enjoining Reynolds from launching any product that competes with PartProtection or is otherwise derived from PartProtection's trade secrets;

(i) enter a permanent injunction enjoining Reynolds from launching any product that competes with PartProtection or is otherwise derived from PartProtection's trade secrets;

(j) award exemplary damages for Reynolds' willful and malicious misappropriation of PartProtection's trade secrets;

(k) award appropriate actual and punitive damages for CDK's and Reynolds' common law violations;

(l) award Plaintiffs their reasonable costs and expenses incurred in this action, including expert fees and attorneys' fees;

(m) award Plaintiffs prejudgment interest; and

(n) award Plaintiffs any such further relief that the Court may deem just and proper.

February 4, 2019

Respectfully submitted,

By: /s/ Whitney M. Carlson
Whitney M. Carlson
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
*Attorney for Plaintiffs i3 Brands, Inc.
and PartProtection, LLC*

58

**Exhibits - Table of Contents**

Exhibit 1 -   Managed Interface Agreement  **(to be filed under seal)**

Exhibit 2 -   Reynolds Interface Agreement  **(to be filed under seal)**

Exhibit 3 -   Reseller Agreement  **(to be filed under seal)**

Exhibit 4 -   Agreement of Basic Terms

Exhibit 5 -   Acknowledgment by i3 Brands, Inc. and PartProtection, LLC

COMPLAINT